# THE HONOLULU RAPID TRANSIT AND LAND COMPANY *v.* THE HAWAIIAN TRAMWAYS COMPANY, Limited.

ORIGINAL SUBMISSION.

SUBMITTED MARCH 29, 1901.          DECIDED APRIL 25, 1901.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

By Act XVIII, Session Laws 1884, William R. Austin and associates were granted a franchise to build and operate for a period of thirty years "a single track street railway with all necessary curves, switches and turnouts or a double track street railway" along and over certain enumerated streets in the city of Honolulu. A time limit was fixed by the legislature for the commencement of the railway at one year and for its completion at three years. The time for completing the road was by subsequent Act extended to September 15, 1889. The Act extending the time limit provided "that said railway must be completed and equipped and ready for transportation of passengers," etc., within the time fixed and if not so completed "all rights hereby granted shall terminate and the franchise hereby granted become void and of no effect. Provided that for such portions of said road as shall at that time be completed and equipped as above required, the right herein granted shall stand and be of full force and effect."

*Held:* That the assignee of Austin having elected to construct, equip and complete a single track street railway within the time limit fixed by law has no right under the terms of the franchise to now construct a double track railway.

The granting clause of the franchise to Austin and associates being

silent as to the motive power to be used in propelling the cars along said railway; held that it was intended by the legislature that only such motive power should be used as was at that time in general and common use by street railway companies, and that the right to use electric traction was not intended to be given, at least, if its use would add an additional servitude to the street.

Section 3 of the Act of 1884 of the grant to Austin and associates reserved the right to give to one other corporation the right to use the tracks of said railway for a distance of 1700 feet on compliance with the conditions named therein, and did not grant to Austin and assigns an exclusive franchise for the use of the streets enumerated beyond the distance of 1700 feet.

Assuming, but not deciding, that under Act 69, Session Laws 1898, the Honolulu Rapid Transit and Land Company has a valid franchise and that it can acquire the right to lay its track along King Street between Nuuanu stream and Thomas Square in the manner stipulated in the agreed facts: Held that under the agreed facts said company has the right to construct and operate its railway over said street.

### OPINION OF THE COURT BY GALBRAITH, J.

The facts of this controversy as set forth in the submission signed by the parties thereto, are as follows, to wit:

1. "That the said Tramways Company, as authorized by law, is operating a street railway or tramway in Honolulu in the Territory of Hawaii and occupies a single track with switches and turnouts on King street from the Waikiki road to a point near the government pumping station at Kalihi. Said Tramways Company proposes to lay a double track, other than the necessary turnouts and switches, along said King street and to operate thereon a tramway by electricity."

2. "That the said Honolulu Rapid Transit & Land Company is the lawful holder of a franchise granted to Clinton G. Ballentyne and others by Acts 69 and 70 of the Session Laws of 1898, and having received a petition from the majority of the owners of property on said King street asking it to lay a railway along said

street, and the Executive Council having consented thereto for that portion of said King street lying between Nuuanu stream and Thomas Square, it proposes to lay such railway and to operate the same on said street between said points, the distance between said points being greatly in excess of seventeen hundred (1700) feet."

3. "That no act which could be construed as an act of acceptance of the Act of 1890 was done by the Hawaiian Tramways Company, Limited, until after the expiration of the time limit set out in the Act of 1895."

4. "That in the month of June, 1899, the Hawaiian Tramways Company, Limited, notified the Minister of the Interior of its intention to lay a double track on all the roads covered by its franchise, and inclosed in the notification to the Minister of the Interior a statement of the proposed alignment of the double track on the streets and requested the Minister of the Interior to notify the company if he had any suggestions to make as to the grade or alignment. About the 25th of July, 1899, the Minister of the Interior replied to the Hawaiian Tramways Company, Limited, stating that he had no objection to the laying of the proposed tracks and no suggestions to offer as to the grade or alignment, and the Hawaiian Tramways Company, Limited, thereupon proceeded with the work preparatory to laying the double track."

Following are the issues of law and fact:

1. "Has the Hawaiian Tramways Company, Limited, the right to lay the double track along King street as above described?"

2. "Has the Hawaiian Tramways Company, Limited, the right to operate a tramway by electricity?"

3. "Has the Honolulu Rapid Transit & Land Company the right to lay a track on King street for more than 1700 feet?"

The issues presented by this submission necessitate the interpretation of the grant of power and construction of the rights of these private corporations to the use and occupancy of a public street in Honolulu.

By Act XVIII of the Session Laws of 1884, a grant was made to "William R. Austin and his associates and assigns or such corporation as may be incorporated or organized by him or them, to construct, lay down, maintain and operate for the term of thirty years from the passage of this Act, a single track street railway with all the necessary curves, switches and turnouts or double track street railway through such of the streets mentioned in this Act  *  *  *  along and upon the following streets in the city of Honolulu," etc.   King street was one of the streets enumerated.   The Hawaiian Tramways Company, Limited, is the successor and assign of William R. Austin.

Section 3 of this Act reads as follows:

"The Legislature of the Hawaiian Kingdom, or the Minister of the Interior when authorized thereto by the Legislature, may grant to one other corporation and no more the right to use, either of the aforesaid streets for a distance of 1700 feet and no more, upon the following conditions: that each company, person or corporation using the said track jointly shall pay an equal proportion for the construction and maintenance of the portion of the track so used jointly.   This section shall apply to persons and companies as well as corporations."

It is provided in Section 6 of said Act that the work of construction of the said street railway should be commenced within one year from the date of the passage of the Act and should be completed within three years thereafter.   Section 7 of the original Act of 1884 reads as follows:

"A failure on the part of said William R. Austin, his associates and assigns or successors to comply with the provisions of this Act shall work a forfeiture of the right of way and of the franchise granted upon such streets as are not occupied by track at the expiration of three years."

This section was amended by Act XVIII of the Session Laws of 1886, so as to read as follows:

"That the said railway must be completed and equipped and ready for transportation of passengers within two years, and if not so completed within the said two years then all rights hereby granted shall terminate and the franchise hereby granted become void and of no effect.   Provided that for such portions of said road as shall at that time be completed and equipped as above

required, the right herein granted shall stand and be of full force and effect."

The time limit was subsequently extended to the 15th day of September, 1889, by Act XXIII, Session Laws of 1888.

On the 14th day of November, 1890, an Act permitting the Hawaiian Tramways Company, Limited, to use electricity as a motive power, was approved, reading as follows:

"Section 1.    Permission is hereby granted to the Hawaiian Tramways Company, Limited, to use and maintain electric power for moving and propelling their cars and to carry such wires which may be necessary therefor, over and along or under the highways and public roads and across lands and waters.

"Section 2.    The said permission is granted subject to the following conditions; 1—The said company shall not interfere with or impair the telephone service.    2—It shall erect and maintain its posts and lines so as not to interfere with the public use of the streets, highways and public roads.    3—Whenever its lines are laid underground the necessary excavations shall be immediately filled and the streets, highways and public roads restored to the condition in which they were before such excavations were made."

By Act 24 of the Session Laws of 1895 Section 2 of this Act was amended by adding paragraphs 4, 5, 6, 7 and 8.    Paragraph 4 of said amendatory Act reads as follows:

4.    "The authority granted by this Act to use and maintain electric power for moving cars must be made use of and the application of electricity for said purpose completed and put in good working order prior to January 1st, 1897, otherwise the authority conferred by this Act shall cease and determine on the date last named."

The other paragraphs of said Act provide conditions and safeguards that must be observed and applied in utilizing electric traction.

By Act 69 of the Session Laws of 1898 a grant was made to Clinton G. Ballentyne and others conferring the right "to construct, lay down, maintain and operate for the term of thirty years after the railway authorized by this Act shall have been commenced a railway, either single or double track, or partly single and partly double, with such curves, switches, turnouts,

poles, wires, underground or overhead conduits, and such other appliances and appurtenances as may from time to time be necessary for the use and operation thereof, along and upon the following streets, roads and places in the District of Honolulu," etc. The portion of King street described in the statement of facts is not enumerated therein. It is provided in said Act that "whenever the majority of the owners of property on any street or road in said Honolulu shall, in writing, petition said association and others to lay a railway in such street or road, and the Executive Council shall consent thereto, such railway may be laid thereon, and thereafter may be maintained and operated for the unexpired term of the franchise."

The following section enumerates the motive power that may be used in the operation of said railway.

Section 6 of this Act provides in part as follows:

"Authority is hereby conferred upon the said association and others to occupy the streets and use the tracks of the Hawaiian Tramways Company in accordance with the provisions of Section 3 of Chapter 34 of the Laws of 1884, entitled 'An Act granting to William R. Austin and his associates the right to construct and operate a street railroad upon certain streets in the city of Honolulu,' provided that said association and others shall comply with the provisions and requirements of this section."
\*   \*   \*

2.   \*   \*   \*   \*   \*   \*   \*   \*   \*

"3. In the use of any portion of the tracks of the Hawaiian Tramways Company, the cars of the Hawaiian Tramways Company or of the said association and others, shall not remain standing on the portion used jointly, but shall make only such stops as are required to take on and let off passengers."

The Honolulu Rapid Transit & Land Company is the successor and assign of the franchise and privileges granted to Clinton G. Ballentyne and associates.

It will be necessary to construe and apply all of the foregoing legislative grants in answering the questions presented by the submission.

The first question to be considered is—Has the Hawaiian Tramways Company, Limited, the right to lay a double track

along that portion of King street over which it has constructed and now operates a single track railway? It is conceded that said company has forfeited all rights to streets and portions thereof named in the grant that were not so occupied within the time limit as extended in the Act of 1888.

It is contended by the Tramways Company that the grant to it gave the right and privileges to construct, lay down and operate a single track railway or a double track railway. That by the terms of the grant the option was left with it to determine whether or not it would lay a single or a double track and that this option might be exercised at any time within the thirty years life of its franchise, whenever its convenience or the public interests might require it; that the time limit fixed in the original grant set forth and extended in the Acts of 1886 and 1888, did not refer to the exercise of this option and only required the construction of a line of railway for the transportation of passengers within the time fixed; that when the line was so constructed the rights accompanying the grant became vested. In support of this contention the language of Section 4 of the Act of 1884 is cited: "Whenever the said William R. Austin," etc., "shall elect to operate said railway or either of them in whole or in part by the use of an endless wire rope or cable," etc., and other sections of said Act where the word "railways" is used. These citations can scarcely be said to support counsel's claim when it is remembered that they are used in the original Act containing the grant to William R. Austin and his associates to construct a single or a double track railway. We cannot presume that the legislature knew which the grantee would elect to construct. The use of the plural in this connection means no more than a recognition on the part of the legislature that at that time the grantee had a right to elect to construct a double track railway. Again it is contended that the time limit does not apply to the exercise of this option for the reason that the forfeiture provided for in Section 7 of the Act of 1884 only applies to "such streets as are not occupied by track" at the expiration of the time limit. Paragraph 7 of Section 6 as amended by the Act of 1886 prescribes "that the said railway must be

24

completed and equipped and ready for transportation of passengers within two years, and if not so completed," etc., the forfeiture attaches. The language of this section is clearly against the contention of the Tramways Company. It is within common and general knowledge that a single track railway and a double track railway are two different and distinct things. The latter places a double servitude on a public highway. On some streets the one would be permitted while the other would not. This distinction was doubtless in the mind of the legislature when in the Act of 1886 it was prescribed that on some streets only a single track railway should be constructed. The word "completed" has a well defined meaning and its use in this last quoted section seems significant. The legislature is presumed to have known the meaning of the language used and to have had a clear and definite idea to express in the use of the phrase "said railway shall be completed," etc. The word complete is defined as "wanting no part or element; perfect, whole, entire."—Cent. Dict. vol. 2. Now if a street railway is completed when a single track line is constructed it does not require the addition of another track to make it perfect, whole, entire or complete. If the railway was not "completed" when the single track railway was constructed and operated then a forfeiture has already occurred and the franchise is void and of no further force or effect. Either position is fatal to the right claimed by the Tramways Company.

The industry of counsel has cited many cases, but none of these are controlling authority. They all involve the construction of the language of different grants of power; in each the language used both in the grant and in defining limitations and conditions must govern in determining the extent of the power given.

Under the terms of the grant to the Tramways Company the option was given it to construct either a single or a double track railway on the streets named but whatever track was constructed must have been "completed and equipped" on or before the 15th day of September, 1889. Under the terms of its grant

it had no power or authority to construct any further line of railway after said date.

In reaching this conclusion it has not been necessary to invoke the well established rule relative to the construction of corporate charters requiring a strict construction against the grantee. The rule is expressed by the Supreme Court of the United States as follows: "By a familiar rule, every public grant of property, or of privileges or franchises, if ambiguous, is to be construed against the grantee and in favor of the public; because an intention, on the part of the government, to grant to private persons, or to a particular corporation, property or rights in which the whole public is interested, cannot be presumed unless unequivocally expressed or necessarily to be implied in the terms of the grant; and because the grant is supposed to be made at the solicitation of the grantee, and to be drawn up by him or by his agents, and therefore the words used are to be treated as those of the grantee; and this rule of construction is a wholesome safeguard of the interest of the public against any attempt of the grantee, by the insertion of ambiguous language, to take what could not be obtained in clear and express terms." *Central Transport Co. v. Pullman Car Co.*, 139 U. S. 49; *Charles River Bridge v. Warren Bridge*, 11 Pet. 420, 544-548.

The next question is—Has the Hawaiian Tramways Company the right to operate its railway by electricity?

The grant to William R. Austin and associates was silent as to the motive power to be used in propelling the cars over the proposed railway, but Section 4 of the Act permits the grantee to use wire or rope cable operated by stationery engines as a motive power at any time he might elect so to do. From this fact it is argued that it was the intention of the legislature to give to Austin and his associates the right and privilege to take advantage of and to apply in the operation of its railway any and all improved devices in motive power that would enable this corporation to keep abreast of twentieth century progress and to enable it at all time to give what the public has a right to expect and demand—a modern, up-to-date street car service. That any other construction would be strained and unwarranted and would

be in effect to condemn the public to the use of "an antiquated car service" for the remainder of the term of the company's franchise. This argument might appeal to the sympathy or the civic pride of the court but fails to command the respect of its judgment, especially in the light of the knowledge that this company, by express legislative grant, had permission "to use and maintain electric power for moving and propelling their cars and to carry such wires which may be necessary therefor, over and along or under the highways and public roads and across lands and waters" from the 14th day of September, 1890, until the 1st day of January, 1897, and that this privilege was not accepted and was permitted to lapse by non-user.

The general rule is as follows: "It is, indeed, questionable whether the silence of the ordinance upon this point will not be construed to mean that such motive power only may be used as is in common use at the time of the enactment of the ordinance. There is reason for presuming that the parties contemplated only such a use of the streets as was at the time ordinarily made by street railway companies." Elliott, Roads & Street Railways, p. 561; *North Chicago City Ry. Co. v. Lake View*, 105 Ill. 207.

Although the idea that electricity might be brought into general use as a motive power may have been familiar to the minds of the legislators in the year 1884, the time of the original grant to the Tramways Company, the court will take judicial knowledge of the fact that electricity had not at that time been brought into such general use. In the absence of clear terms indicating an intention on the part of the legislature that electric traction should be used by this company in propelling its cars along its track, we do not believe that we would be authorized to interpolate such an intention into the terms of the grant unless it were plain that such use would impose no additional servitude on the street. It is possible that a system of storage batteries or some new and improved electric motor appliance, not familiar to the court, might be substituted for the present motive power by the company. On this question we do not feel called upon to pass at this time. However we are clear that the company can-

not under the terms of its grant make use of electricity as a motive power if the same is applied by means of some of the well known systems now in common use, such as the overhead trolley system or the underground cable system for the reason that each of these systems would impose an additional servitude on the public street. The fact that in Section 4 of the Act of 1884 permission is given to use a wire or rope cable operated by stationary engine demonstrates conclusively either one of two things—that the use of electric or other traction that would add an additional servitude to the street was not before the mind of the legislature or that it was not intended to give the right to use such traction. In any event this right cannot be successfully claimed under any implied power. The right if it exists at all must be based on a clear grant.

It is a matter of general knowledge that electricity is a powerful and dangerous force and that its use, especially on the public highway, should not be permitted unless guarded by proper and necessary restrictions. This purpose was plainly demonstrated by the legislature in the Act of 1895, amending the Act of 1884, giving the Tramways Company permission to use electricity as a motive power and the Act of 1898, granting the franchise to Ballentyne and associates.

It is apparent that the Tramways Company did not consider that it had the right under the Act of 1884 or that of 1886, to use electricity as a motive power or at least that it felt great doubt on the subject, so much doubt, in fact, that it applied to the legislature in the year 1890 and was granted permission to use electric traction. We say that the company applied to the legislature for this additional grant, for under the rule announced by the U. S. Supreme Court (139 U. S. 49, supra) this Act of 1890 is presumed to have been passed at the solicitation of the Tramways Company. Under the stipulation filed herein, the Tramways Company are claiming no rights under this Act of 1890 or the Act of 1895 amendatory thereof, and we only refer to it in this connection for the purpose of showing that the company at that time, at least, entertained a doubt concerning the right so confidently asserted in this proceeding and for the

further purpose of showing a legislative interpretation against the right now claimed by the company.

This brings us to the consideration of the last question in the submission: "Has the Honolulu Rapid Transit & Land Company the right to lay a track on King street for more than 1700 feet?"

The question seems to and in fact does imply that said company has the right to lay a track on King street for a distance of seventeen hundred feet and the point in controversy is concerning the existence of the right to lay a track for a greater distance. It will be recalled that in Section 1 of the Act of 1884, the Tramways Company was granted the right to lay a single or a double track railway on and along the streets enumerated therein and that said streets constitute the principal thoroughfares of the city of Honolulu.

In Section 3 of said Act it is provided as follows:

"The legislature of the Hawaiian Kingdom or the Minister of the Interior when authorized thereto by the legislature, may grant to one other corporation and no more the right to use either of the aforesaid streets for a distance of seventeen hundred feet and no more, upon the following conditions: that each company, person or corporation using the said track jointly shall pay an equal portion for the construction and maintenance of the portion of this track so used jointly."

Section 6 of the Act granting a franchise to the assignors of the Rapid Transit Company provides:

"1st. Authority is hereby conferred upon the said association and others to occupy the streets and use the tracks of the Hawaiian Tramways Company in accordance with the provisions of Section 3 of Chapter 34 of the Laws of 1884, entitled 'An Act granting to William R. Austin and his associates,' etc. * * * provided that the said association and others shall comply with the provisions and requirements of this section."

2d. Provides for the manner of making crossings over the tracks of the Tramways Company when necessary.

"3d. In the use of any portion of the tracks of the Hawaiian Tramways Company, the cars of the Hawaiian Tramways Company or of the said association and others shall not remain stand-

ing on the portion used jointly, but shall make only such stops as are required to take on and let off passengers."

It is conceded that the Rapid Transit Company is the "one other corporation" privileged as provided in Section 3 above quoted and is entitled to all rights reserved by said section as modified or enlarged by Section 6 of the Act of 1898.

The claim is urged by the Tramways Company that by said Section 3 it was granted the exclusive right for the term of its franchise to the use of the streets enumerated in Section 1 of the Act of 1884, excepting only the right of the legislature to give one other corporation the right to use any one of said streets for a distance of 1700 feet and no more; that by this grant the exclusive right subject only to the above exception became vested when said streets and each of them were occupied by its railway and that this grant when accepted by the Tramways Company became a contract between the government and the company, the obligations of which are now inviolable by the courts as well as by the legislature.

The authorities do not agree on the question of the power of legislatures to grant exclusive rights and privileges to private corporations even for a limited number of years. "There is some conflict in the decided cases," says Elliott, "upon the question of the power of the legislature to grant an exclusive right to a street railway company to occupy and use a highway. The weight of authority is that the legislature cannot create a monopoly by granting an exclusive privilege, and this we regard as the sound doctrine." Roads & Streets, p. 566 and cases cited in Note 1.

However much doubt there may be on the question where the terms of the grant are plain and show a clear intent on the part of the legislature to grant an exclusive franchise, no doubt or uncertainty can arise where the terms of the grant are ambiguous and uncertain. In such cases every presumption is against an exclusive grant. Under the rule of strict construction every ambiguity is construed against the grantee and in favor of the public. Section 3 is clearly ambiguous. The object and purpose of the legislature in its enactment are not apparent on

first or even second reading. If it had been the purpose of the legislature to grant an exclusive right to the Tramways Company we would naturally look to the first section of the Act, the granting clause of the charter for an expression of such purpose. We look in vain to that section for any word or phrase indicating an intent to make the grant exclusive. We are forced to the conclusion that it was not the purpose or intention of the legislature to give the Tramways Company an exclusive privilege to use the streets named for street railway purposes.

It seems that the more reasonable construction is to hold that Section 3 was a limitation on the grant made in Section 1. That in it a right was reserved in the franchise granted or a condition was prescribed on which the grant was made. The right was reserved to the legislature, not to grant to another corporation the right to use the same streets with a separate line of railway, —it already had that right and had not parted with it—but to grant to one other corporation the right to use either of the "aforesaid streets," i. e., the streets enumerated in Section 1 for a distance of 1700 feet only and in the same manner in which the Tramways Company was using the aforesaid streets, by having its cars drawn over the tracks of the Tramways Company on condition that it pay an equal proportion of the cost of construction and maintenance of the portion of the track "so used jointly." If this construction gives expression to the real intention of the legislature in enacting Section 3, it may be defended on the ground that it was at that time and is now a matter of common knowledge that some of the streets enumerated in Section 1 were so narrow that two tracks of railway laid parallel on them would occupy the entire street to the great annoyance and inconvenience of the public. As an illustration of this class of legislation we cite Massachusetts statutes of 1864, C. 229, permitting one street railway to use the track of another and the construction of this statute in *Metropolitan R. R. Co. v. Quincy R. R. Co.*, 12 Allen 262.

We are not called upon at this time and do not pass on the question whether the condition or reserved right in Section 3 is capable of enforcement on account of the failure to prescribe

any method for determining the amount of the "equal portion for the construction and maintenance of the portion of the track so used jointly," or the manner and time of payment. It could in no event be held that the property of the Tramways Company could be appropriated by the Rapid Transit Company without making just compensation therefor.

The right of the Rapid Transit Company to build its line on King street between Nuuanu Stream and Thomas Square is claimed under paragraph 11 of Section 2 of the Act of 1898, granting the franchise to its assignors, which reads as follows:

"Whenever the majority of the owners of property on any street or road in said Honolulu shall, in writing, petition said association and others to lay a railway in such street or road, and the Executive Council shall consent thereto, such railway may be laid thereon, and thereafter may be maintained and operated for the unexpired term of the franchise."

It is admitted that a majority of the property owners along said proposed route have petitioned the Rapid Transit Company, in writing, asking it to lay a railway along said street, and that the Executive Council has consented thereto.

The parties to this case have taken advantage of the provision of the statute authorizing the submission to the Supreme Court of any question of difference between persons that might become the subject of a civil action. This statute affords an expeditious method of settling litigation. By it, however, the parties prescribe the limits of judicial inquiry by the agreed statement of facts. The court is not bound nor expected to go beyond the questions raised by the parties. It is scarcely necessary to state that the public or any person not a party to the submission whose interests may be affected adversely are not precluded by the decision. It is not binding except on the parties who have had their day in court in regard to the questions decided.

The opinion in this case is based on the construction of the several statutes hereinbefore quoted. The court is not called upon nor does it express an opinion on the question of the validity of Act 69 of the Session Laws of 1898, nor on the effect of the passage of the Joint Resolution of Annexation, or the enact-

ment of the Organic Act thereon. The agreed facts state that the "said Honolulu Rapid Transit and Land Company is the lawful holder of a franchise," etc. For the purposes of this submission and as between the parties hereto, we assume this statement to be true, and also that the Rapid Transit and Land Company had the power to acquire the right claimed in the manner provided in the statute and set forth in the agreed facts.

It follows that the judgment of the court is, that question number one should be answered in the negative and that number two should be answered in the negative with the qualification expressed in the opinion, and that question number three should be answered in the affirmative; and that this judgment is given without prejudice to any right the public may have in said street adverse to the parties to the submission or either of them. And it is so ordered.

*Kinney, Ballou & McClanahan* for Rapid Transit Company.

*Holmes & Stanley* and *P. Neumann* for Hawaiian Tramways Company.